## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| TRINITY GRAPHIC, USA, INC., a Florida corporation, | CASE NO.: 8:18-cv-00230-SCB-MAP |
| *Plaintiff*, | |
| vs. | |
| TERVIS TUMBLER COMPANY, a Florida corporation, SOUTHERN GRAPHICS, INC., a Delaware corporation, and SGS INTERNATIONAL, LLC, a Delaware limited liability company, | |
| *Defendants*. | |

### PLAINTIFF TRINITY GRAPHIC, USA, INC.'s
### *AMENDED* COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Trinity Graphic, USA, Inc. ("Trinity"), through its undersigned counsel, files this *Amended* Complaint against Defendants Tervis Tumbler Company ("Tervis"), Southern Graphics, Inc. ("SG"), and SGS International, LLC ("SGS") (SG and SGS are collectively referred to as "Southern") (collectively "Defendants"), and in support states as follows:

### I.      INTRODUCTION

1.      This action arises out of a well-orchestrated and fraudulent conspiracy to steal trade secrets worth tens of millions of dollars and cut Trinity, a small Florida-based printing company, out of the market it helped build. For years, Tervis sought the technology and know-how that would allow it to print specialized, high-quality graphics on its drink-ware. Tervis approached Trinity to develop a solution. After investing millions of dollars of its own money, Trinity delivered the exact solution Tervis sought.

2.      Trinity was one of Tervis's leading suppliers. But Tervis eventually grew tired of paying Trinity millions of dollars for its specialized printing technique. So Tervis attempted to figure out Trinity's techniques on its own. When those efforts failed, Tervis formulated a plan to trick Trinity into sharing certain printing techniques while stealing Trinity's trade secrets. Tervis found a willing co-conspirator in Southern, which conspired to aid Tervis in the fraud and theft of trade secrets and assured Tervis that it could provide the exact same service once they stole the right information from Trinity.

3.      The plan worked. Tervis misrepresented to Trinity that it would remain a key supplier so long as Trinity continued to meet its specifications, quality standards, service levels, pricing, and other requirements. Trinity did just that – in no uncertain terms, Trinity created and set the standard that Tervis demanded its other suppliers match. Under the guise of quality control and supplier standardization, Tervis repeatedly demanded Trinity reveal detail after detail about its trade secret printing technique.

4.      When Trinity would not comply, Tervis fraudulently induced Trinity into signing a Non-Disclosure Agreement with absolutely no intention of honoring that agreement's terms. In reliance on that Non-Disclosure Agreement, Trinity disclosed its trade secret printing technique to Tervis. Tervis then took that information to Southern, transferred all of the relevant business to Southern, and promptly fired Trinity. As a result of their misconduct, Tervis and Southern have reaped tens of millions of dollars in ill-gotten profits, while Trinity has been left teetering on the brink of bankruptcy.

5.      This is an action for misappropriation of trade secrets, breach of contract, fraud, aiding and abetting, and conspiracy with damages in excess of $25 million.

## II.    PARTIES

6.      Trinity Graphic, USA, Inc., is a Florida corporation with its principal place of business located at 885 Tallevast Road, Sarasota, Florida 34243. Trinity is a digital print solutions company that manages creative, custom, and branded projects for its clients. Trinity specializes in developing state-of-the-art printing technology and innovative printing techniques.

7.      Defendant Tervis Tumbler Company is a Florida corporation with its principal place of business located at 201 Triple Diamond Boulevard, North Venice, Florida 34275.

8.      Defendant SGS International, LLC, is a Delaware limited liability company with its principal place of business located at 626 West Main Street, Suite 500, Louisville, Kentucky 40202.

9.      Defendant Southern Graphics, Inc., is a Delaware corporation with its principal place of business located at 626 West Main Street, Suite 500, Louisville, Kentucky 40202. Defendant Southern Graphics, Inc., is the parent company of SGS International, LLC.

10.     Defendant SG holds itself out as a global collective of complimentary companies within the printing and packaging market. SG also represents that all operations between its collective of companies, including SGS, are related and intertwined, such that the various companies collaborate and operate as one. SGS is a mere instrumentality or alter ego of SG and SG engaged in the improper conduct described herein directly and through SGS. In some instances, SG and SGS share employees and executives. The individuals within Southern responsible for the claims set forth below were, at all times material, acting as agents of both SG and SGS.

### III.   JURISDICTION AND VENUE

11.     Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367.

12.     This Court has original jurisdiction over Trinity's causes of action for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.

13.     This Court has supplemental jurisdiction over Trinity's other causes of action arising under state law pursuant to 28 U.S.C. § 1367 because those claims are so closely related to Trinity's DTSA claims that they form part of the same case or controversy under Article III of the United States Constitution.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Trinity's claims against the Defendants occurred in this judicial district.

15.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Tervis's principle place of business is within this judicial district and Southern maintains a tumbler insert printing facility within this judicial district.

### IV.   GENERAL ALLEGATIONS

16.     Tervis manufactures insulated double-walled cups, known as tumblers, as shown below:



17.     Tervis inserts designs between the double-wall of tumblers ("tumbler inserts"). Tumbler inserts often contain licensed imagery, such as sports team logos or Disney characters. For many years, tumbler inserts were made from fabric patches or a single-sided, flat image, as demonstrated below:



18.     In 2009, Tervis's then-President Laura Spencer ("Spencer") was attending a networking group where fellow attendee Robert Smithson ("Smithson") was demonstrating his company's printing capabilities.

19.     Smithson is the CEO and founder of Trinity. He had started Trinity in 1995. Given its small size, Trinity's only way of competing against larger printing companies was through state-of-the-art printing technology and innovative printing techniques.

20.     Spencer was intrigued by Trinity's presentation. Shortly thereafter, in August 2009, Spencer approached Smithson and asked if Trinity could improve Tervis's tumbler inserts.

21.     At the time, Tervis tumbler inserts were made from crude and costly embroidery or flat, one-sided images. Tervis wanted something more eye-catching. Spencer asked if Trinity could help.

22.     Trinity agreed to devise a tumbler insert concept for Tervis.

   **a.  Trinity Revolutionizes the Tumbler Insert with the "Trinity Wrap"**

23.     From September 2009 to November 2010, Trinity invested substantial time, money, and resources to develop a technique for printing two-sided tumbler inserts. Trinity's tumbler inserts are a wrap-a-round image printed on a transparent material known as a substrate (the "Trinity Wrap"). The Trinity Wrap creates the illusion of looking through a three-dimensional image, as demonstrated below:



24.     Trinity created a trade secret technique to print the Trinity Wrap, comprised of several interdependent elements. The trade secret technique is not integrated or merged into the Trinity Wrap itself. Rather, the result of the trade secret technique is the Trinity Wrap.

25.     The trade secret technique to print the Trinity Wrap includes the following: (1) a technique that dramatically reduces static electricity generated by the transparent substrate during the printing process, which significantly increases the printed image's visual sharpness; (2) a technique to print perfectly aligned two-sided images on the transparent substrate by expanding the technological capability of commercially available printers; and (3) creation of color profile formulas to perfectly match the color palettes of the licensed imagery printed on the Trinity Wrap (collectively these techniques and other knowledge related to these techniques are referred to as the "Trade Secrets"). Each element of the Trade Secrets was required to successfully replicate the Trinity Wrap.

26.     Trinity received virtually no guidance from Tervis, nor was it paid for the research, development, and creation of the Trade Secrets. At all relevant times, the technology and know-how belonged solely to Trinity.

### b. The Trade Secret Technique to Print the Trinity Wrap
#### i. Solving the "Static Electricity" Issue

27.     After conceptualizing the Trinity Wrap, Trinity needed to find a transparent substrate that, among other things, was heat resistant, pliable, and FDA compliant.

28.     After testing several options, Trinity chose a transparent substrate that met each requirement. The problem: The material was a poor choice for high-quality printing because it generated static electricity when heated or printed upon. The static electricity attracted dust particles onto the substrate's surface, making images appear hazy.

29.     To overcome this problem, Trinity developed a trade secret technique to significantly reduce static electricity in the printing process. The result was a crisp, high-resolution image on the transparent substrate.

#### ii. Perfecting Image "Registration"

30.     To achieve the three-dimensional two-sided appearance of the Trinity Wrap, Trinity needed to print perfectly aligned layered images on the transparent substrate through a process called "registration." Perfectly registered images create the illusion of looking behind the image when looking into or at a tumbler. The margin for error is miniscule because even the smallest misalignment of the image is detectable by the human eye and results in a "hazy halo" around the printed image.

31.     To achieve perfect registration, Trinity worked with Electronics For Imaging, Inc. ("EFI"), an industry-leading manufacturer of complex printing equipment. Trinity and EFI entered a non-disclosure agreement so they could discuss the Trinity Wrap and the equipment necessary to print it.

32.     Trinity purchased a state-of-the-art GS Vutech printer from EFI ("Vutech Printer") that was capable of printing high-quality images but, it was not initially capable of printing perfectly registered two-sided images.

33.     After approximately ten months of extensive research and development, and over a million dollars in expenses, Trinity expanded the technological capabilities of the Vutech Printer. Trinity was then able to utilize the Vutech Printer to implement its Trade Secret technique to print perfectly registered two-sided images on a transparent substrate.

### iii.   Creating Color Profiles

34.     To print licensed imagery on the Trinity Wrap, Trinity had to develop color profile formulas for each and every print job.

35.     The color profile creation process generally took several weeks per project and required Trinity to calibrate the color output on each of its Vutech Printers in order to achieve identical colorization on each print job. Once each color profile was completed, the final color palette was submitted to the image licensor for approval.

36.     The process of formulating color profiles is unique for every color printed on a specific Trinity Wrap and for each color in a licensed image printed on a Trinity Wrap.

### c. Trinity's Reasonable Measures to Protect the Secrecy of its Trade Secrets

37.     From the beginning, Trinity took extensive measures to keep the information and techniques comprising the Trade Secrets a secret. These steps included:

    a.   Restricting physical access to its production facility where the Trinity Wrap was printed;

    b.   Monitoring its production facility with security cameras;

    c.   Requiring key-FOB entry to its production facility;

    d.   Maintaining records of individuals who entered its production facility;

    e.   Requiring its employees to sign confidentiality and non-disclosure agreements;

    f.   Holding regular staff meetings to reinforce and remind its employees of the confidential and trade secret nature of the Trinity Wrap printing technique;

    g.   Requiring vendors involved in the Trinity Wrap printing technique to execute non-disclosure agreements;

    h.   Requiring customers touring Trinity's production facility to sign confidentiality agreements;

    i.   Requiring EFI to execute a non-disclosure agreement prior to engaging in talks regarding Trinity's printing technique; and

    j.   Requiring Tervis to execute a confidentiality and non-disclosure agreement prior to disclosure of the Trade Secrets.

38.     Trinity's efforts to maintain the secrecy of its Trade Secrets were reasonable under the circumstances.

39.     Due to the nature of the Trade Secrets and the proprietary techniques developed to print the Trinity Wrap, the Trade Secrets were not openly visible to individuals within Trinity's production facility. As such, disclosure of the Trade Secrets required an affirmative explanation and demonstration.

### d.  The Trinity Wrap Propels Tervis Tumbler Sales

40.     The Trinity Wrap was a significant development in the tumbler-manufacturing world.

41.     In 2010, Trinity presented a prototype of the Trinity Wrap to Spencer, who stated that the Trinity Wrap was the "future for Tervis Tumbler."

42.     In a handshake deal between Trinity and Tervis, Trinity agreed to print all of Tervis's tumbler inserts.

43.     The Trinity Wrap went into mass production in or around October 2010.

44.     The Trinity Wrap was a huge success. In under five years, the Trinity Wrap helped propel Tervis's annual revenue from roughly $45 million to $150 million, in part by expanding Tervis's ability to obtain licensing partnerships with major media organizations.

45.     As tumbler sales grew, Tervis demanded that Trinity make additional, substantial capital investments in printing equipment and expand its facilities to accommodate ever-increasing volume.

46.     In return, Trinity asked Tervis for a contract memorializing their handshake agreement and committing Tervis to using Trinity as its manufacturer. But Tervis refused, insisting that its oral promises and handshake deal were enough.

47.     In reliance of Tervis's repeated representations, Trinity leased 7,000 square feet of additional space and invested millions of additional dollars in printing equipment.

48.     On June 10, 2013, almost three years after Trinity developed the Trade Secrets, Tervis agreed to enter into a freely terminable agreement that included boiler plate terms and conditions for all future written work orders for tumbler inserts ("Master Agreement"). *See* Exhibit "A" – Master Agreement. The Master Agreement did not obligate Tervis to purchase any tumbler inserts or continue using Trinity as a manufacturer.

49.     By 2014, Trinity was producing approximately eight million units per year. Trinity continued to request that Tervis enter an agreement to purchase a minimum annual quantity of tumbler inserts and commit to using Trinity as a manufacturer. Tervis refused and again represented that Trinity should rely on its handshake promises and its long-standing reputation in the industry.

### e.    Tervis Attempts to Uncover Trinity's Trade Secrets

50.     It was common knowledge at Tervis that Trinity created and owned the intellectual property for the technique to print the Trinity Wrap. It was also widely known that Trinity took numerous measures to protect its Trade Secrets that were reasonable under the circumstances.

51.     But this did not stop Tervis from trying to uncover Trinity's Trade Secrets, often under the guise of quality control and learning about its most valued supplier.

52.     In response to Tervis's requests that it disclose its Trade Secrets and teach its technique to print the Trinity Wrap, Trinity asked Tervis to sign a non-disclosure agreement. Tervis declined. With no agreement in place, Trinity refused to disclose its Trade Secrets.

53.    But Tervis kept trying. In early January 2011, Tervis requested a guided tour of Trinity's facility, under the guise of supplier quality control. Trinity complied and provided a guided tour to Tervis's supply management team. Before the tour began, Trinity hid, and in some cases removed, materials from its secure facility that potentially could have revealed information about its Trade Secrets and material suppliers to Tervis's agents. Likewise, Trinity instructed that none of its employees who had knowledge of the Trade Secrets should answer any of Tervis's questions regarding the Trinity Wrap printing technique.

54.    Trinity's suspicions about Tervis's intentions were well-founded. During the tour, Trinity employees noticed a Tervis agent lagging behind and writing down the model numbers of Trinity's printers.

55.    Almost immediately thereafter, still in January 2011, EFI notified Trinity that Tervis had inquired as to what United States-based printing companies owned a Vutech Printer. The purpose of Tervis's inquiry was to locate an alternate printing source.

56.    Trinity confronted Tervis and complained of its underhanded tactics to Luis Lopez ("Lopez"), Tervis's Supply Chain Manager. Lopez denied knowledge of any contact between EFI and Tervis.

57.    In mid-2011, Lopez informed Trinity that Tervis had hired Nosco, Inc. ("Nosco"), to print one-sided tumbler inserts. Per Lopez, Tervis intended to significantly increase its demand for tumbler inserts. Tervis was getting too big to rely solely on Trinity. It needed other vendors who could replicate the Trinity Wrap.

58.     That was the problem. Even before engaging Trinity, Tervis had spent years attempting to create something akin to the Trinity Wrap. All of those efforts had failed. After engaging Trinity, Tervis had tried to reverse engineer the Trinity Wrap printing technique. All of those efforts had failed. Tervis had even gone to other printing companies in the market, but nobody could replicate the Trinity Wrap.

59.     Because no other company was able to replicate the Trinity Wrap, Tervis requested that Trinity share all of the pertinent information—including its Trade Secrets—with the new suppliers. Trinity declined and made clear to Tervis that it would not share its Trade Secrets with any of its competitors, even with a non-disclosure agreement.

### f.   Tervis and Southern Conspire to Cut Trinity Out of the Tumbler Insert Market

60.     Southern is a global flexographic printing and packaging giant that advertises its ability to print at lower costs due to its vertically integrated corporate structure. Several collective companies under the Southern umbrella work together to meet client needs. Those collective companies include SG, the parent, and SGS, a subsidiary.

61.     In early 2014, Matthew Kane, Esq. ("Kane"), Tervis's Chief Legal Officer, and Florida Bar member, informed Dan Davidson ("Davidson"), SGS's Vice President, that Tervis was doing a significant amount of business with Trinity because of the Trinity Wrap. At this time, Southern was not in the digital printing business.

62.     In March 2014, Southern requested a meeting with Smithson, and Trinity's then CEO Bill Ceperich ("Ceperich"), to discuss the potential acquisition of Trinity and its Trade Secrets. On or about March 4, 2014, Smithson and Ceperich met Davidson and SG's Chief Operating Officer, Luca Naccarato ("Naccarato"), at Hyde Park Prime Steakhouse in

Sarasota, Florida.

63.     At the Hyde Park Dinner, Southern broached the possibility of acquiring Trinity and its business with Tervis. Under the guise of acquisition talks, Southern learned as much as it could about Trinity's business before the talks abruptly ended shortly after the Hyde Park Dinner. But Trinity never disclosed its Trade Secrets.

64.     Southern saw an opportunity. Given Southern's size and scale, it could print tumbler inserts at a significantly lower cost. Southern realized that rather than acquire Trinity, it would replace it.

65.     Naccarato, Davidson, and Marriott Winchester ("Winchester"), President of the Americas for SG and Executive Vice President of SGS, were instrumental in Southern's conspiracy with Tervis to take out Trinity and cutover all printing business to Southern.

66.     Almost immediately, Southern, through Naccarato and Davidson, made Tervis an incredible offer: It would print tumbler inserts akin to the Trinity Wrap at an average unit cost that was one-third the price charged by Trinity.

67.     To achieve this price point, Southern would use Jetrion Printers, which were cheaper and faster than Trinity's Vutech Printers, but at the cost of a lower quality product.

68.     Tervis promptly offered Southern a manufacturing contract. Trinity learned of Southern's contract through several of its employees.

69.     At first, Tervis denied the contract's existence to Trinity. However, this changed once Tervis and Southern realized that replicating the Trinity Wrap would not be a simple process. It took Trinity, an experienced printing company, nearly a year to research and develop a printing technique to create the Trinity Wrap. For Southern to step in and

match Trinity's output, it would need one of two things: (1) Trinity's help or (2) Trinity's Trade Secrets. Tervis and Southern decided they would obtain both.

70. Tervis put a plan into action, with no intention to retain Trinity as a supplier, where it would (1) use false representations to induce Trinity to implement its Trade Secret technique using the Jetrion Printers at its own expense, (2) use false representations to induce Trinity to teach Southern the printing technique, (3) steal Trinity's Trade Secrets, and (4) cut out Trinity as a supplier once Southern was capable of handling Trinity's workload.

### i. The Supplier Acknowledgement Letter

71. In Summer 2014, Tervis advised Trinity that Southern had been offered a contract because it had made significant investments in printing equipment. Trinity, which had also made significant investments in equipment at Tervis's behest, asked for a contract similar to Southern's. Tervis responded that it no longer offered contracts.

72. However, Tervis demanded that Trinity invest in new printing equipment as part of a cost saving initiative. Specifically, Tervis mandated Trinity replace its Vutech Printers with Jetrion Printers, the same printers purchased by Southern. In response, Trinity reiterated its request that Tervis commit, in writing, to use Trinity as a supplier of tumbler inserts. In part, this was because Trinity would need to make another substantial investment in printing equipment, which would require additional financing.

73. At this point, Trinity had already invested millions of dollars in the Vutech Printers at Tervis's behest.

74. In October 2014, Tervis's then-CFO, John Shute, provided Trinity and Trinity's creditors with a letter acknowledging that Trinity was and would remain a key

supplier for Tervis. *See* Exhibit "B" – Tervis Acknowledgement Letter. The Acknowledgement Letter provided in relevant part:

> With the implementation of their newly purchased printing technologies, Trinity will remain a key supplier of wraps to Tervis provided they are able to meet our specifications, quality standards, service levels and pricing and other requirements.

75.     At the time Tervis made these representations, Tervis knew these representations were false. Tervis never intended to retain Trinity as a supplier. Instead, Tervis's goal was to induce Trinity to take the Trade Secret technique it had developed in 2010 and implement that technique using Jetrion Printers at Trinity's own expense. Tervis then intended to steal that technique and cut Trinity out as a supplier.

76.     Relying on Tervis's representations, Trinity obtained several million dollars in financing to purchase Jetrion Printers, purchase additional printing equipment, and hire new employees.

77.     Trinity was able to implement its Trade Secret technique on the Jetrion Printers and successfully print the Trinity Wrap. Trinity also translated each color profile formula it had developed on the Vutech Printer for use with the Jetrion Printer.

78.     All in, Trinity had spent close to $10,000,000 on equipment to service Tervis's needs.

79.     As Trinity would repeatedly prove, not only did it meet all of Tervis's specifications, quality standards, service levels, pricing, and other requirements, it set the standard that Tervis wanted its other suppliers to match.

### ii.   Additional Acts in Furtherance of the Fraudulent Conspiracy

80.     Tervis continued to demand tours of Trinity's facility, under the guise of

supplier quality control, while Trinity was implementing its Trade Secret printing technique using the Jetrion Printers. During these facility tours, Trinity concealed the model numbers of all printing equipment, ink containers, and all other supplies and equipment used in its Trade Secret printing technique.

81.     Shortly after Southern signed its contract with Tervis, it leased a manufacturing facility approximately 1.2 miles from Tervis's Florida headquarters.

82.     However, Southern did not immediately begin production. It experienced numerous delays related to sub-standard printing quality, color profile variations, and its Jetrion Printer burst into flames during an attempt to replicate Trinity's Trade Secret printing technique. Most importantly: Southern could not figure out how to print perfectly registered images or substantially reduce static electricity when printing on transparent substrates – the core function of Trinity's Trade Secret. The result was a tumbler insert that was blurry and misaligned.

83.     Tervis grew frustrated and impatient. Southern was taking too long to figure out how to print and would not be able to supply tumbler inserts during Tervis's busiest time of the year, the holiday season. However, Trinity was there to support Tervis's needs and ran 24-hour shifts to help Tervis satisfy its 2014 holiday season demand. Rather than be thankful, Tervis was upset that orders which would have gone to Southern, its preferred supplier, were diverted to Trinity.

84.     As such, Tervis demanded that Trinity reduce its pricing. Trinity, in its effort to meet all of Tervis's needs, complied.

85.    Throughout 2015, it became well known to Trinity that Lopez, John Day ("Day"), Tervis's Director of Materials, and other individuals from Tervis regularly met with Naccarato, Davidson, and other individuals at Southern.

86.    By mid-2015, Southern began printing tumbler inserts. However, Southern's tumbler inserts were noticeably inferior in quality to those printed by Trinity, and Southern's color profile formulas deviated from Trinity's, which were the standard accepted by Tervis's licensor clients.

87.    At the same time, between April and July 2015, Southern made new acquisition overtures to Trinity in an effort to ferret out more information regarding Trinity's business and Trade Secret printing technique. However, Trinity took reasonable precautions against Southern by requiring a Non-Disclosure Agreement before engaging in any substantive conversations. When Southern was unable to get the information it wanted, the acquisition talks ended.

### iii.  The Color Coordination "Kaizen Meetings"

88.    In August 2015, Tervis acting through Day and Lopez, announced an initiative to establish printing uniformity among its entire supplier chain.

89.    Tervis directed Trinity to lead the initiative to coordinate uniform color profiles for Jetrion printing amongst Tervis's supplier portfolio, i.e. Southern and Nosco. Tervis designated this initiative as the "Kaizen Meetings".

90.    Tervis made it clear to Trinity: Meet its requirements by teaching Southern and Nosco how to calibrate their Jetrion Printers to match Trinity's color output or lose all of Tervis's business.

91.     Tervis underestimated the difficulty and time it would take to complete color coordination among all suppliers. Tervis became frustrated because it made Trinity indispensable for the time being.

92.     The Kaizen Meetings continued until October 2016 and Trinity continued to oblige Tervis's requests to coordinate color among its suppliers. In part, this was because Trinity knew that color was only one element of its Trade Secret printing technique and that without all of the elements of that technique, nobody could utilize its Trade Secrets and replicate the Trinity Wrap.

### g.   Tervis Misappropriates Trinity's Trade Secrets

93.     By early 2016, Tervis and Southern had developed a timeline for diverting all of Trinity's printing to Southern. But Tervis knew that it could not remove Trinity from its supply chain until Southern was able to replicate the Trinity Wrap. This would take more than color coordination – Tervis and Southern would need the entire Trade Secret printing technique.

94.     The Defendants' predicament is documented in a February 10, 2016, email sent by Lopez of Tervis to Winchester, who at the time was President of the Americas for SG and Executive Vice President of SGS. The email's subject line reads "SGS Issues", copies Tervis's Chief Operations Officer, Bruce Wayne Varnadore ("Varnadore") and states:

> [Winchester],
>
> Dan [Davidson, of SGS,] conveyed the **registration challenges SGS is having.** How much longer will this take to resolve? Our timeline has not moved since our last conversation **to cutover to SGS**.

*See* February 10, 2016, Email attached hereto as Exhibit "C". (emphasis added).

95.     Shortly thereafter, Tervis demanded a site visit to Trinity's facilities for a demonstration of its Trade Secret printing technique. Trinity denied this request and all future visits unless Tervis signed a non-disclosure agreement that protected Trinity's Trade Secrets.

96.     Tervis recognized its opportunity to steal Trinity's Trade Secrets and solve Southern's printing problems. Tervis represented to Trinity that a non-disclosure agreement already existed between the companies that protected Trinity's intellectual property from unauthorized disclosure. However, when Trinity received a copy of said agreement, it turned out to be one-sided and only protected Tervis.

97.     On March 1, 2016, Greg Barba ("Barba"), Trinity's President, met with Tervis who agreed to enter into a new bilateral non-disclosure agreement. On March 2, 2016, Lopez sent an email to Winchester, copying Varnadore, with the subject line "Registration Issues". The email stated:

> [Winchester],
>
> We may have info to assist you in a few days so no change to the deadline is needed.

*See* March 2, 2016, Email attached hereto as Exhibit "D".

98.     On March 7, 2016, Lopez emailed Kane, Tervis's Chief Legal Officer, about getting an NDA in place:

> [Kane]:
>
> How quickly can you send an NDA to [Trinity President] Greg Barba @ Trinity. They specifically asked for IP protection. This is extremely time-sensitive if we wish to make the SGS deadline.

*See* March 7, 2016, Email attached hereto as Exhibit "E".

99.     That same day, Lopez emailed his colleague Varnadore to reassure him that the plan to misappropriate Trinity's Trade Secrets and move the work over to Southern was still on schedule:

> [Varnadore],
>
> Matt [Kane] is working the NDA for Trinity. **This should open up the info SGS needs.** Plan a visit asap to gather whatever is needed to get them over this latest hump. I don't want the timeline to slip again.

*See* March 7, 2016, Email attached hereto as Exhibit "F". (emphasis added).

100.     On or about March 7, 2016, Tervis transmitted its Confidentiality and Non-Disclosure Agreement ("NDA") to Trinity. Trinity executed the NDA on March 8, 2016. *See* NDA, attached hereto as Exhibit "G".

101.     The NDA protected all information considered by Trinity, the disclosing party, to be confidential and/or a trade secret from unauthorized use or disclosure. *Id*.

102.     To expedite its transition to Southern, through a series of email and verbal communications, Tervis also sought information regarding Trinity's ink and transparent substrate suppliers and order specifications.

103.     In May 2016, framed as an effort to complete standardizing color profile formulas amongst suppliers, Tervis gave Trinity an ultimatum: Disclose all color profile formulas or all remaining orders would be canceled. Faced with losing Tervis's business, and seemingly protected by the NDA, Trinity acquiesced.

104.     Over the course of the next several months, from mid-May through October 2016, Trinity provided Southern, Tervis, and Nosco with a book and computer file containing all of the color profile formulas that it had spent years developing and perfecting.

105.    In mid-June 2016, with the NDA in place, Tervis demanded a site visit to Trinity's facility. Trinity complied. During the visit, Tervis demanded a demonstration of the Trade Secret Trinity Wrap printing technique. Tervis again threatened to cancel all remaining orders unless Trinity disclosed the desired information. Tervis representatives reiterated that Trinity's Trade Secrets were protected by the NDA.

106.    Relying on the NDA and Tervis's representations, Trinity demonstrated the Trinity Wrap printing technique and explained that technique to Tervis. At no time prior to this moment had Trinity disclosed the printing technique used in the creation of the Trinity Wrap to either Tervis or Southern.

107.    Immediately after the June 2016 meeting, in violation of the NDA, Tervis disclosed Trinity's Trade Secrets to Southern.

108.    Less than a month later – and despite the years in which no printing company had replicated the Trinity Wrap – Southern "solved" its registration and static electricity issues. Southern began to print the Trinity Wrap for Tervis.

109.    There is no doubt: Southern acquired the Trade Secrets from Tervis, knowing Tervis had acquired them through deception and while under a legal duty to maintain their secrecy.

### h.  The 'Cutover' to Southern

110.    Now that Southern could print the Trinity Wrap, and the color coordination initiative was nearing completion, Tervis no longer needed Trinity. As Southern increased its production capacity, Tervis decreased its orders with Trinity.

111.    But Tervis could not simply eliminate Trinity for no reason, that would be too suspicious considering Trinity continuously met all of Tervis's specifications, quality standards, service levels, pricing, and other requirements. In fact, Trinity consistently received outstanding scores on Tervis's quarterly performance scorecards. Instead, Tervis would create the pretense of fair competition.

112.    On July 20, 2016, Tervis represented to Trinity that it was implementing a competitive bidding process among its three suppliers: Trinity, Southern, and Nosco. As a result of that process, Tervis would eliminate one of those suppliers and redirect all production to two suppliers.

113.    That was a lie. In reality, Southern did not participate in the bidding process because Tervis had guaranteed Southern that it would remain a supplier.

114.    On August 4, 2016, in reliance on Tervis's representations, Trinity submitted a bid with drastically reduced pricing.

115.    In between Trinity's bid submission and Tervis's decision, Tervis awarded Southern a dramatically larger printing workload.

116.    During the week of August 15, 2016, Smithson invited Tervis's President, Rogan Donelly ("Donelly"), and General Manager Gary King, to visit Trinity's facility. Smithson demonstrated Trinity's capabilities and commitment to printing the Trinity Wrap for Tervis in an effort to remain one of the two suppliers. Trinity demonstrated that it was capable of handling all of Tervis's printing. Smithson also suggested a facility management solution whereby Trinity would place equipment into Tervis's facility to provide faster support and better pricing. Donelly represented he would consider Smithson's proposals.

117. On August 23, 2016, Smithson followed up with Donelly and requested a second meeting for August 24, 2016. Donelly stated he would get back with Smithson shortly.

118. Instead, on August 24, 2016, Tervis, through Day, announced that it had "delayed" the bidding process and that business would continue as usual due to the approaching "busy season." In spite of this, Tervis demanded that Trinity honor its bid price for all future orders.

119. Trinity was devastated. It had been tricked into lowering its prices and drastically reducing its margins.

120. From September through December 2016, Tervis continued to reduce its orders with Trinity, despite Trinity performing its services better than Southern and Nosco. By December 2016, traditionally Tervis's busiest time of the year, orders to Trinity were a fraction of what they had been in prior years.

121. In December 2016, Southern and Tervis pounced to cut out Trinity once and for all.

122. On December 5, 2016, fully informed of Trinity's distressed position, and now printing the Trinity Wrap without issue, Southern, through Winchester and Naccarato, offered to purchase Trinity's printing equipment and projected 2017 sales with Tervis (which were minimal).

123. On December 9, 2016, Trinity discovered that Tervis had put out a request for proposals, to Southern and Nosco, for in-house printing at Tervis's facility. This was the same proposal Smithson had made to Donelly in August 2016. Now that Trinity had

discovered Tervis's request for proposals, it reluctantly allowed Trinity to bid. In a last-ditch effort to retain Tervis's business, Trinity scrambled and put together a competitive bid package that contained far more favorable pricing than the bids from Southern and Nosco.

124.    While Trinity waited for Tervis to make a decision regarding the bids, Trinity repeatedly asked Southern for a letter of intent concerning its purported purchase of Trinity's equipment and projected sales. Although Trinity would have preferred to continue printing for Tervis, it saw a purchase from Southern as a way to pay-off its debt for the equipment it financed in reliance of Tervis's representations that it would remain a key supplier.

125.    On January 9, 2017, Trinity met with Lopez, Day, and Britt Irwin of Tervis to discuss its proposal. Tervis appeared shocked that Trinity had out-bid Southern and Nosco. Tervis had one question for Trinity: Did Trinity understand what Tervis was requesting of it for their production needs? Trinity did. Tervis represented that if Trinity could make good on its bid, it would receive 100% of Tervis's business for printing the Trinity Wrap. Trinity explained that it could.

126.    After this meeting, Tervis informed Southern of Trinity's bid and its intent to immediately cut Trinity out if Southern could match Trinity's pricing. Southern obliged.

127.    On January 19, 2017, Trinity was invited to an early morning meeting at Tervis's facility to learn the results of the bidding process. At the meeting, Tervis explained that Trinity had been eliminated as a supplier.

128.    On January 20, 2017, Trinity received a letter from Tervis terminating the Master Agreement effective February 10, 2017. *See* Termination Letter attached hereto as Exhibit "H".

129.    Southern was given the remainder of Trinity's orders for printing the Trinity Wrap.

130.    Southern then offered to purchase Trinity's equipment for below fair market value. With no other options, Trinity agreed.

131.    As of the date of this Complaint, Southern continues to print the Trinity Wrap using Trinity's misappropriated Trade Secrets.

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS**
**IN VIOLATION OF 18 U.S.C. § 1836(b)**
**(as to Tervis)**

132.    Trinity re-alleges and incorporates paragraphs 1 through 131 as if fully set forth herein.

133.    Tervis markets, distributes, and sells tumblers with the Trinity Wrap across the United States.

134.    The Trinity Wrap is a product used in interstate commerce.

135.    Trinity is the sole owner of the Trade Secrets that comprise the methods, processes, procedures, and techniques for printing the Trinity Wrap.

136.     Trinity took reasonable steps to maintain the secrecy of its Trade Secrets.

137.    The Trade Secrets had independent economic value as they were not generally known to other persons or businesses and could not be ascertained through proper means.

138.    Prior to misappropriation, the Trinity Wrap had been in existence for over five years. No competitor, including Southern, could replicate or reverse engineer the Trade Secrets for printing the Trinity Wrap.

139.    On March 8, 2016, Trinity and Tervis entered into an NDA that was intended to protect Trinity's Trade Secrets from unauthorized use or disclosure. Tervis never intended to abide by the NDA.

140.    In June 2016, Trinity disclosed its Trade Secrets to Tervis pursuant to the protections afforded by the NDA.

141.    Tervis acquired knowledge of the Trade Secrets under circumstances giving rise to an express duty to maintain the secrecy of the Trade Secrets and to limit the use or disclosure of the Trade Secrets.

142.    Tervis and Southern knew that Trinity considered the methods, processes, procedures, and techniques comprising the Trade Secrets for printing the Trinity Wrap to be trade secrets.

143.    Without Trinity's express or implied consent, Tervis disclosed the Trade Secrets to, at minimum, Southern.

144.    At the time of Tervis's disclosure to Southern, Tervis knew that the Trade Secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and to limit the use of the Trade Secrets.

145.    Tervis knew its disclosure of Trinity's Trade Secrets to Southern was in contravention of its duty to maintain secrecy.

146.    Tervis misappropriated Trinity's Trade Secrets by using and disclosing Trinity's Trade Secrets in contravention of its duty to maintain secrecy.

147.    Tervis also misappropriated Trinity's Trade Secrets by its acquisition, use, and disclosure of the Trade Secrets through improper means.

148.    Tervis's improper means include: (1) Misrepresenting to Trinity that it would protect the Trade Secrets pursuant to the NDA when it never intended to abide by the NDA and (2) Breaching an express duty to maintain the secrecy of the Trade Secrets.

149.    Tervis's conduct in this manner was both willful and malicious.

150.    As a direct result of Tervis's misappropriation of Trinity's Trade Secrets, Trinity has suffered and continues to suffer significant damages in an amount to be proven at trial.

### COUNT II
### MISAPPROPRIATION OF TRADE SECRETS
### VIOLATION OF 18 U.S.C. § 1836(b)
### (as to Southern)

151.    Trinity re-alleges and incorporates paragraphs 1 through 131 as if fully set forth herein.

152.    Tervis markets, distributes, and sells tumblers with the Trinity Wrap across the United States.

153.    Southern prints, manufactures, and supplies the Trinity Wrap to Tervis.

154.    Trinity is the sole owner of the Trade Secrets that comprise the methods, processes, procedures, and techniques for printing the Trinity Wrap

155.    Trinity and Southern were direct competitors in the printing of tumbler inserts for Tervis.

156.    Trinity repeatedly refused to disclose its Trade Secrets to its competitors, including Southern.

157.    Trinity took reasonable steps to maintain the secrecy of its Trade Secrets.

158.    The Trade Secrets had independent economic value as they were not generally known to other persons or businesses and could not be ascertained through proper means.

159.    Prior to misappropriation, the Trinity Wrap had been in existence for over five years. No competitor, including Southern, could replicate or reverse engineer the Trade Secrets for printing the Trinity Wrap.

160.    Southern communicated to Tervis that it was unable to replicate or reverse engineer the Trinity Wrap and that it would need Tervis's assistance to do so.

161.    On March 8, 2016, Trinity and Tervis entered into an NDA that was intended to protect Trinity's Trade Secrets from unauthorized use or disclosure.

162.    Southern knew that Trinity and Tervis entered into the NDA.

163.    In June 2016, Trinity disclosed its Trade Secrets to Tervis pursuant to the protections afforded by the NDA.

164.    Tervis and Southern knew that Trinity considered the methods, processes, procedures, and techniques comprising the Trade Secrets for printing the Trinity Wrap to be trade secrets.

165.    Without Trinity's express or implied consent, Tervis disclosed the Trade Secrets to, at minimum, Southern.

166.    Southern's acquisition and use of Trinity's Trade Secrets constitutes misappropriation because the acquisition occurred after Southern knew or had reason to know that Tervis was under a duty to maintain the secrecy of the Trade Secrets and that Tervis had acquired the Trade Secrets through improper means.

167.     Southern also misappropriated Trinity's Trade Secrets because it has used, and continues to use, Trinity's Trade Secrets after using improper means to acquire them.

168.     Southern's conduct in this manner was both willful and malicious.

169.     As a direct result of Southern's misappropriation of Trinity's Trade Secrets, Trinity has suffered and continues to suffer significant damages in an amount to be proven at trial.

<u>COUNT III</u>
**BREACH OF CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT**

170.     Trinity re-alleges and incorporates paragraphs 1 through 131 as if fully set forth herein.

171.     On or about March 8, 2016, Trinity and Tervis entered into the NDA.

172.     The NDA protected from unauthorized disclosure all information considered by the disclosing party to be proprietary and confidential and/or a trade secret.

173.     At the time the NDA was executed, Tervis did not have knowledge of the information considered by Trinity to be proprietary and confidential and/or a trade secret.

174.     At all times material, Trinity upheld its obligations under the NDA.

175.     In June 2016, Trinity disclosed the Trade Secrets to Tervis pursuant to the protections afforded by the NDA.

176.     Tervis knew that Trinity considered the methods, processes, procedures, and techniques for printing the Trinity Wrap to be trade secrets.

177.     Subsequently, Tervis materially breached the NDA when it disclosed Trinity's Trade Secrets to, at minimum, Southern.

178.     Tervis's disclosure of Trinity's Trade Secrets was unauthorized.

179.     As a direct result of Tervis's breach of the NDA, Trinity has suffered and continues to suffer significant damages in an amount to be proven at trial.

**COUNT IV**
**FRAUD**
**(as to Tervis)**

180.     Trinity re-alleges and incorporates paragraphs 1 through 131 as if fully set forth herein.

181.     Tervis, SG, and SGS conspired to eliminate Trinity from the market.

182.     Neither Tervis, SG, SGS, nor any other market actor could replicate or reverse engineer Trinity's Trade Secrets.

183.     Tervis made numerous material misrepresentations to Trinity, including:

    a.  Trinity would remain a key supplier of Trinity Wraps provided Trinity met Tervis's specifications, quality standards, service levels, pricing, and other requirements;

    b.  Demanding site inspections of Trinity's facilities under the guise of quality control and under other false pretenses;

    c.  That it would honor the NDA while knowing at the time the NDA was executed that it intended to disclose the Trade Secrets to SG and SGS; and

    d.  That it was implementing a competitive bidding process among its three suppliers and as a result of that process, Tervis would eliminate the supplier with the highest pricing;

184.     At the time of making these representations, Tervis knew each of these representations was false.

185.    Tervis intended for its false representations to induce Trinity to (1) make substantial investments in printing equipment, including the Jetrion Printers; (2) implement its Trade Secret printing technique using Jetrion Printers; (3) translate color profile formulas from the Vutech Printers to Jetrion Printers for the benefit of Tervis, SG, and SGS; (4) permit Tervis to tour Trinity's facilities under the pretext of supplier quality control in an attempt to learn about Trinity's Trade Secret printing technique and divert that information to SG and SGS; (5) execute the NDA and disclose its Trade Secrets; and (6) repeatedly reduce it prices.

186.    In reliance on Tervis's false representations, Trinity did each of these things.

187.    Trinity justifiably relied on Tervis's numerous material misrepresentations about remaining a supplier. Trinity believed it would remain a key supplier of the Trinity Wrap if it complied with Tervis's requests. To wit: Trinity met Tervis's specifications, quality standards, and service levels such that Tervis used Trinity as the standard bearer for each with its other suppliers. Trinity met all requirements mandated by Tervis, including investing in new printing equipment and leading Tervis's color coordination initiative to create uniformity as to color amongst all of Tervis's suppliers.

188.    Trinity likewise relied on Tervis's misrepresentations that its factory visits and inspections were for purposes of quality control; that information it requested Trinity to share with other vendors was being sought for the purposes of standardization among suppliers; that the NDA was intended to facilitate further business between Trinity and Tervis; that the NDA would protect Trinity's Trade Secrets from unauthorized use or disclosure; and that Tervis would honor the representations contained in the NDA.

189.     After getting what it wanted, Tervis cut Trinity out as a supplier in furtherance of its conspiracy and in contravention of its numerous representations to Trinity.

190.     As a direct result of Tervis's fraud, Trinity has suffered and continues to suffer significant damages in an amount to be proven at trial.

**COUNT V**
**AIDING AND ABETTING FRAUD**
**(as to SG and SGS)**

191.     Trinity re-alleges and incorporates paragraphs 1 through 131 and 181 through 190 as if fully set forth herein.

192.     Tervis's material misrepresentations to Trinity constitute fraud.

193.     SG and SGS had knowledge of the fraud and provided substantial assistance to Tervis to advance the commission of the fraud.

194.     SG and SGS substantially assisted the fraud through the following actions:

a. Coordinating with Tervis to replace Trinity as a supplier;

b. Seeking information about Trinity's proprietary printing technique under the guise of acquisition talks when neither SG nor SGS had any actual intention of acquiring Trinity;

c. Seeking information about Trinity's proprietary printing technique under the guise of acquisition talks with the real goal of utilizing any information acquired from Trinity to steal its Trade Secret printing technique, cut Trinity out of the market, and capture all of Trinity's business with Tervis;

d. Communicating with Tervis regarding their efforts to replicate the Trinity Wrap and instructing Tervis regarding specific additional information related

34

to the Trinity Wrap printing technique that Tervis needed to steal in order to complete their mission;

e.   Conspiring with Tervis to cause Trinity to disclose its Trade Secrets; and

f.   Participating in Tervis's sham supplier bidding process.

195.   As a result of Tervis's fraudulent conduct and SG's and SGS's assistance, Trinity made substantial investments in new printing equipment, implemented its Trade Secret printing technique utilizing Jetrion Printers, disclosed its Trade Secrets to Tervis, provided Southern with proprietary color profile formulas, and submitted and honored low bids as part of Tervis's sham bidding process. SG and SGS has used and are using all of Trinity's Trade Secrets to their economic advantage.

196.   As a direct and proximate cause of SG's and SGS's aiding and abetting Tervis in its fraud, Trinity has suffered significant damages in an amount to be proven at trial.

## COUNT VI
## CIVIL CONSPIRACY
### (as to all Defendants)

197.   Trinity re-alleges and incorporates paragraphs 1 through 131 as if fully set forth herein.

198.   In or around late 2014, Tervis, SG, and SGS, began conspiring to defraud Trinity, steal the Trade Secrets, and eliminate Trinity from the market.

199.   As a result of the conspiracy, Tervis would obtain reduced pricing and SG and SGS would obtain Trinity's Trade Secrets as well as Trinity's market share.

200.   In furtherance of the conspiracy, Tervis, SG, and SGS engaged in conduct that constitutes misappropriation of trade secrets, fraud, and aiding and abetting fraud.

Specifically, Tervis, SG, and SGS acted in concert to perpetrate a scheme that involved the following:

   a.  A long-standing relationship between Tervis, SG, and SGS;

   b.  Explicit agreements between Tervis, SG, and SGS that they would collectively steal Trinity's Trade Secrets and cut Trinity out of the market;

   c.  Efforts to obtain information about Trinity's Trade Secret printing technique through false representations that SG and/or SGS was contemplating the acquisition of Trinity when neither SG nor SGS had any intention of acquiring Trinity;

   d.  Falsely representing to Trinity that it would remain a Tervis supplier when Tervis, SG and SGS intended to eliminate Trinity as a supplier;

   e.  Inducing Trinity to spend millions of dollars on new printers, equipment, and employees based on the fraudulent representation that Trinity would remain a Tervis supplier;

   f.  Inducing Trinity to implement its Trade Secret printing technique utilizing Jetrion Printers;

   g.  Fraudulently inducing Trinity into entering NDAs with both Tervis and SG/SGS when none of the Defendants intended to honor the contractual obligations contained in those NDAs;

   h.  Fraudulently inducing Trinity to disclose its Trade Secret printing technique under the guise of quality control and supplier standardization and with the false representation that such disclosure was protected by an NDA;

    i.   Inducing Trinity to participate in a sham bidding process in which SG/SGS did not actually participate and then forcing Trinity to honor its low bid; and

    j.   Collectively stealing Trinity's Trade Secret printing technique and eliminating them as a Tervis supplier, thereby leading to Trinity's economic collapse and allowing SG/SGS to purchase Trinity's remaining printing equipment at a substantially discounted price.

201.    As a direct and proximate result of Defendants' conspiracy, Trinity has suffered significant damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment in its favor granting the following relief:

1. Compensatory damages for actual loss caused by Defendants' misappropriation of Plaintiff's Trade Secrets to the fullest extent permitted by law;

2. The disgorgement of Defendants' profits accrued as a result of the misappropriation of Plaintiff's Trade Secrets to the fullest extent permitted by law;

3. Exemplary damages for Defendants' willful and malicious misappropriation of Plaintiff's Trade Secrets to the fullest extent permitted by law;

4. Compensatory damages for Defendant Tervis's breach of contract to the fullest extent permitted by law;

5.  Compensatory damages for Defendant Tervis's fraud and Defendants SG's and SGS's aiding and abetting fraud, and Defendants' civil conspiracy to the fullest extent permitted by law;

6.  Punitive damages for Defendant Tervis's fraud, Defendants SG's and SGS's aiding and abetting fraud, and Defendants' civil conspiracy to the fullest extent permitted by law;

7.  Plaintiff's reasonable attorneys' fees and costs;

8.  Pre-judgment and post-judgment interest;

9.  Such other relief this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 17, 2018                                 Respectfully submitted,

                                                     By: /s/ *Jonathan Pollard*
                                                     Jonathan E. Pollard
                                                     Florida Bar No.: 83613
                                                     jpollard@pollardllc.com
                                                     **Trial Counsel**

                                                     Christopher S. Prater
                                                     Florida Bar No.: 105488
                                                     cprater@pollardllc.com

                                                     David J. Yaffe
                                                     Florida Bar No.: 125488
                                                     dyaffe@pollardllc.com

                                                     **Pollard PLLC**
                                                     401 E. Las Olas Blvd.
                                                     Suite, #1400
                                                     Fort Lauderdale, FL 33301
                                                     Telephone: 954-332-2380
                                                     Facsimile: 866-594-5731
                                                     *Attorneys for Plaintiff Trinity Graphic, USA, Inc.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 17, 2018, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, who will provide electronic notification to all counsel of record.

By: /s/ *Jonathan Pollard*
Jonathan E. Pollard